No. 23-12533-B

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

PERFECTION BAKERIES, INC.,

Plaintiff-Appellant,

v.

RETAIL, WHOLESALE AND DEPARTMENT STORE
INTERNATIONAL UNION AND INDUSTRY PENSION FUND,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Alabama, Southern Division
The Honorable AnneMarie Carney Axon

---

**BRIEF OF PLAINTIFF-APPELLANT**

---

Mark M. Trapp
Conn Maciel Carey LLP
53 W. Jackson Blvd., Suite 1352
Chicago, Illinois 60604
(312) 809-8122
mtrapp@connmaciel.com

*Counsel for Plaintiff-Appellant*
*Perfection Bakeries, Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. Pro. 26.1 and 11th Cir. Rule 26.1-1, the undersigned counsel for Appellant Perfection Bakeries, Inc. certifies that the following is a list of all judges, attorneys, persons, firms, associations of persons, partnerships, and corporations currently believed to have an interest in the outcome of this case or appeal, and other legal entities related to a party:

Anspach, William (Counsel for Defendant/Appellee)

Axon, Annemarie Carney, Hon. (United States District Judge)

Conn Maciel Carey LLP (Counsel for Plaintiff/Appellant)

Friedman Anspach (Counsel for Defendant/Appellee)

Friedman, Eugene (Counsel for Defendant/Appellee)

Maynard Nexsen P.C. (Counsel for Plaintiff/Appellant)

Murphy, Grace (Counsel for Plaintiff/Appellant)

Neiman, John (Counsel for Plaintiff/Appellant)

Perfection Bakeries, Inc. (Plaintiff/Appellant)

Retail, Wholesale and Department Store International Union and
  Industry   Pension Fund (Defendant/Appellee)

Riley, Clyde (Counsel for Defendant/Appellee)

Riley Law Firm (Counsel for Defendant/Appellee)

Trapp, Mark (Counsel for Plaintiff/Appellant)

Treiman, Daniel (Counsel for Defendant/Appellee)

No publicly traded company or corporation has an interest in the outcome of the appeal.

/s/ Mark Trapp
Mark M. Trapp

## STATEMENT REGARDING ORAL ARGUMENT

This case meets the standards in Rule 34(a)(2) for oral argument, in that (a) this appeal is not frivolous, (b) the dispositive issues raised have not been authoritatively decided, and (c) as will be shown in this brief, the decisional process would be significantly aided by oral argument.

Specifically, Appellant asks this Court to split from the Ninth Circuit's decision in *GCIU v. Quad/Graphics*, 909 F.3d 1214 (9th Cir. 2018). That decision is contrary to the statutory text and the sound opinion of the federal agency charged with interpreting Title IV of ERISA. *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1172 n.19 (11th Cir. 1988) ("we owe particularly great deference to PBGC interpretations of Title IV of ERISA[.]").

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF THE ISSUES......................................................2

II.  STATEMENT OF THE CASE .......................................................2

   A.  Nature of the case. ..................................................................2

   B.  The statutory framework. .......................................................3

   C.  Statement of the facts. ..........................................................11

   D.  Course of proceedings below. ...............................................15

      1.  Arbitration testimony. ..................................................15

      2.  Arbitration award. ........................................................21

      3.  District Court opinion. ..................................................22

III. STANDARD OF REVIEW ..........................................................23

IV.  SUMMARY OF THE ARGUMENT ..............................................24

V.   ARGUMENT ..............................................................................25

   A.  The District Court's interpretation is contrary to MPPAA's text. ..................................................................25

      1.  The District Court's interpretation is contrary to the term "withdrawal liability" in 1386(b)(1)..............26

         a.  A withdrawn employer is only liable for "withdrawal liability," and a plan may only collect "withdrawal liability." .............................26

b.  Section 1386(b)(1) calls for the credit to reduce "withdrawal liability," not "the allocable amount of unfunded vested benefits.".............................................28

c.  The District Court failed to give effect to the substantive difference between the "allocable amount of unfunded vested benefits" and "withdrawal liability.".......................................31

d.  The District Court erred in holding that §1405's "final" adjustment to the allocable amount of unfunded vested benefits precluded any reduction to withdrawal liability. ...............................................37

2.  The District Court's interpretation also is contrary to the words "in the case of a partial withdrawal" in §1381(b)(1)(B).........................................40

a.  Construing "in the case of a partial withdrawal" to include a complete withdrawal is not the most natural reading of the statute. ......................................41

b.  Construing "in the case of a partial withdrawal" to include a complete withdrawal impermissibly ignores the statutory definitions. .........................................45

c.  Construing "in the case of a partial withdrawal" to include a complete withdrawal is inconsistent with the usage of that phrase elsewhere in the MPPAA. ...............47

d.  Construing "in the case of a partial withdrawal" to include a complete withdrawal renders the phrase both duplicative and superfluous................................49

B.  In cases where both would otherwise apply, the District Court's interpretation would read out of the statute either the prior partial credit or the 20-year payment cap......................................................................52

C.  The PBGC's rejection of the District Court's interpretation is persuasive and correct. ............................57

VI.  CONCLUSION ..................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alliance for Community Media v. F.C.C.*,
    529 F.3d 763 (6th Cir. 2008) ............................................................. 59

*In re Appling*,
    848 F.3d 953 (11th Cir. 2017) ...................................................... 51, 54

*Autauga County Emergency Mgmt. Communication Dist. v.
    FCC*,
    17 F.4th 88 (11th Cir. 2021) ........................................................ 40, 59

*Bailey v. United States*,
    516 U.S. 137 (1995) ............................................................................. 27

*Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale
    Grocers, Inc.*,
    802 F.3d 534 (3rd Cir. 2015) ............................................. 5, 27, 28, 37

*Bd. of Trustees, Sheet Metal Workers' National Pension Fund
    v. BES Services, Inc.*,
    469 F.3d 369 (4th Cir. 2006) ....................................................... 38, 39

*Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals,
    Inc.*,
    734 F.3d 1297 (11th Cir. 2013) .......................................................... 35

*Blessitt v. Retirement Plan for Employees of Dixie Engine
    Co.*,
    848 F.2d 1164 (11th Cir. 1988) .......................................................... 57

*Burgess v. United States*,
    553 U.S. 124 (2008) ............................................................................. 47

*CBS Inc. v. Primetime 24 Joint Venture*,
    245 F.3d 1217 (11th Cir. 2001) .......................................................... 51

*Central States v. Johnco, Inc.*,
  694 F.Supp 478 (N.D. Ill. 1988) .......................................... 38

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers
  Pension Tr. for S. Cal.*,
  508 U.S. 602 (1993) .......................................................... 4

*Estate of Cummings v. Davenport*,
  906 F.3d 934 (11th Cir. 2018) ............................................ 42

*Garcia-Bengochea v. Carnival Corp.*,
  57 F.4th 916 (11th Cir. 2023) (Jordan, J., concurring) ........... 44

*GCIU v. Quad/Graphics*,
  909 F.3d 1214 (9th Cir. 2018) ........................................... 62

*GCIU-Emp'r Ret. Fund v. MNG Enters., Inc.*,
  51 F.4th 1092 (9th Cir. 2022) ........................................... 42

*Gregory v. First Title of America, Inc.*,
  555 F.3d 1300 (11th Cir. 2009) ......................................... 59

*Hylton v. U.S. Att'y Gen.*,
  992 F.3d 1154 (11th Cir. 2021) ......................................... 45

*Mayo Found. for Med. Educ. & Research v. U.S.*,
  562 U.S. 44 (2011) .......................................................... 61

*MSPA Claims v. Tenet Florida, Inc.*,
  918 F.3d 1312 (11th Cir. 2019) ......................................... 36

*Pitts v. United States*,
  4 F.4th 1109 (11th Cir. 2021) ........................................... 62

*Polycarpe v. E & S Landscaping Serv.*,
  616 F.3d 1217 (11th Cir. 2010) ......................................... 46

*Regions Bank v. Legal Outsource PA*,
  936 F.3d 1184 (11th Cir. 2019) .................................... 44, 56

*Shotz v. City of Plantation, Fla.*,
  344 F.3d 1161 (11th Cir. 2003) ......................................... 51

*Stansell v. Revol. Armed Forces of Col.,*
    704 F.3d 910 (11th Cir. 2013) ............................................ 46

*Trustees of Cent. Pen. Fund v. Wolf Crane Service,*
    374 F.3d 1035 (11th Cir. 2004) .......................................... 23

*Trustees of the Local 138 Pension Trust Fund v. F.W.*
    *Honerkamp Co.,*
    692 F.3d 127 (2nd Cir. 2012) ............................................. 8

*U.S. v. Bryant,*
    996 F.3d 1243 (11th Cir. 2021) .......................................... 54

*U.S. v. Hastie,*
    854 F.3d 1298 (11th Cir. 2017) .......................................... 46

*U.S. v. Jimenez-Shilon,*
    34 F.4th 1042 (11th Cir. 2022) .......................................... 48

*U.S. v. Pate,*
    84 F.4th 1196 (11th Cir. 2023) ............................... 27, 31, 51

*In re Witcher,*
    702 F.3d 619 (11th Cir. 2012) ........................................... 50

**Statutes**

28 U.S.C. § 1291 ..................................................................... 1

28 U.S.C. § 1331 ..................................................................... 1

29 U.S.C. § 1301(a)(11) ......................................................... 6

29 U.S.C. § 1381 ............................................................... 3, 38

29 U.S.C. § 1381(a) .................... 2, 4, 9, 26, 32, 40, 41, 44

29 U.S.C. § 1381(b) ........................................ 5, 26, 32, 41, 58

29 U.S.C. § 1381(b)(1).... 4, 5, 6, 8, 9, 21, 22, 23, 26, 27, 29, 30, 32, 35, 36, 37,38, 39, 40, 41, 42, 43, 45, 47, 50, 57, 58

29 U.S.C. § 1381(b)(2).................................................. 4, 46, 49

29 U.S.C. § 1381(b)(3) ............................................................ 4, 45, 49

29 U.S.C. § 1382(1) .................................................................... 10, 26

29 U.S.C. § 1382(3) ................................................ 10, 26, 27, 55

29 U.S.C. § 1384(a)(1) ..................................................................... 44

29 U.S.C. § 1385 ....................................................................... 45, 46

29 U.S.C. § 1386 ........................ 4, 6, 22, 23, 29, 30, 32, 35, 36, 39, 46, 58

29 U.S.C. § 1386(a) ......................... 6, 7, 22, 29, 30, 32, 33, 36, 45, 47, 50

29 U.S.C. § 1386(a)(1) ..................................... 6, 7, 30, 31, 33, 35, 36, 47

29 U.S.C. § 1386(a)(2) ............................................ 6, 33, 36, 43, 47, 48, 49

29 U.S.C. § 1386(b) ...................................................... 7, 30, 38, 39, 50

29 U.S.C. § 1386(b)(1) ... 2, 7, 20, 24, 25, 28, 29, 30, 31, 32, 34, 35, 36, 37,
38, 40, 45, 46, 51, 52, 54, 56, 58

29 U.S.C. § 1386(b)(2) ................................................................. 54, 60

29 U.S.C. § 1389 .................................... 4, 5, 6, 29, 30, 39, 50

29 U.S.C. § 1389(a) ............................................................. 5, 29, 31

29 U.S.C. § 1390(a) .......................................................................... 44

29 U.S.C. § 1391 ................................. 4, 5, 6, 7, 26, 29, 30, 31, 33, 36, 58

29 U.S.C. § 1391(a) ................................................................... 4, 26

29 U.S.C. § 1391(b)(2) ..................................................................... 33

29 U.S.C. § 1391(b)(4) ..................................................................... 39

29 U.S.C. § 1391(c)(3) ..................................................................... 33

29 U.S.C. § 1393(c) ............................................................................5

29 U.S.C. § 1399(c)(1) ........... 4, 6, 7, 8, 9, 10, 30, 31, 34, 39, 48, 49, 50, 52

29 U.S.C. § 1401 ................................................................. 1

29 U.S.C. § 1401(b)(2) .......................................................... 1

29 U.S.C. § 1401(e)(1) ......................................................... 44

29 U.S.C. § 1401(f)(1) .......................................................... 44

29 U.S.C. § 1405 ......................... 4, 6, 9, 23, 30, 37, 38, 39, 40, 50

29 U.S.C. § 1405(a) ............................................................. 9

29 U.S.C. § 1405(a)(1) ..................................................... 31, 39

29 U.S.C. § 1405(b) ......................................................... 9, 31

29 U.S.C. § 1405(b)(1) ........................................................ 31

29 U.S.C. § 1405(b)(2) ........................................................ 31

29 U.S.C. § 1451(c) ............................................................. 1

**Other Authorities**

29 C.F.R. § 4206.1 ............................................................. 24

29 C.F.R. § 4206.1(a) ......................................................... 61

29 C.F.R. § 4206.3 ......................................................... 25, 60

29 C.F.R. § 4206.6 ............................................................. 13

52 Fed. Reg. 37329 (Oct. 6, 1987) ........................................... 28

Antonin Scalia & Bryan A. Garner, READING LAW: THE
    INTERPRETATION OF LEGAL TEXTS (2012) ......... 37, 42, 44, 47, 49, 51, 54

S. 1076: The Multiemployer Pension Plan Amendments Act
    of 1980: Summary and Analysis of Consideration, 96th
    Cong., 2d Sess., 18 (Comm. Print 1980) ............................... 8

# JURISDICTIONAL STATEMENT

1.     The United States District Court for the Northern District of Alabama had jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question) and under 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(c). Section 1401 requires arbitration of certain disputes arising under the Multiemployer Pension Plan Amendments Act ("MPPAA") and permits a party to bring an action in federal district court to enforce, vacate, or modify an arbitrator's award within 30 days after completion of the proceedings. An arbitrator issued a final award on April 18, 2022. (Dkt. 1-1). On May 4, 2022, Perfection filed an action to vacate the award under 29 U.S.C. § 1401(b)(2) and 29 U.S.C. § 1451(c). (Dkt. 1)

2.     The United States Court of Appeals for the Eleventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

3.     Perfection appealed from the following Orders of the District Court, which disposed of all the parties' claims: (i) Memorandum Opinion and Order dated July 7, 2023 (Dkt. 44), and (ii) Judgment in a Civil Action dated July 7, 2023 (Dkt. 45)

4.     Perfection filed its Notice of Appeal on August 3, 2023.

# I.   STATEMENT OF THE ISSUES

This case involves liability the MPPAA imposes on employers when they withdraw from a multiemployer pension plan. If an employer withdraws from a multiemployer pension plan in a complete withdrawal or partial withdrawal, that statute requires the employer to pay to the plan an amount known as "withdrawal liability." 29 U.S.C. § 1381(a). If that employer previously incurred "withdrawal liability" for a partial withdrawal, MPPAA requires any later "withdrawal liability" of that employer to be reduced by any "partial withdrawal liability" for a previous plan year. 29 U.S.C. § 1386(b)(1).

The central issue here is whether the District Court erred when it applied this credit not to reduce Perfection's subsequent "withdrawal liability," but a different, higher number used to calculate Perfection's subsequent withdrawal liability, such that Perfection received no credit for the partial withdrawal liability it incurred in the past.

# II.   STATEMENT OF THE CASE

## A.   Nature of the case.

In 2016, Perfection experienced a partial withdrawal for which the RWDSU Pension Fund ("the Fund") assessed Perfection more than

four million dollars of withdrawal liability ($2+ million at present value). Less than two years later, Perfection experienced a complete withdrawal.

Under the statute, Perfection should have received credit for its prior partial withdrawal liability against the later withdrawal. Instead, using a method the Pension Benefit Guaranty Corporation ("PBGC") describes as "clearly erroneous," the Fund applied Perfection's credit not to reduce Perfection's subsequent withdrawal liability, but rather to reduce a different, higher number used to calculate that later withdrawal liability – the "allocable amount of unfunded vested benefits."

The practical result of the plan's method was that Perfection received no reduction at all to its complete withdrawal liability, which was as high as it would have been had Perfection never incurred the previous multi-million dollar partial withdrawal. The arbitrator and the District Court affirmed this result. Perfection now appeals.

**B.    The statutory framework.**

In 1980, the MPPAA amended ERISA to create withdrawal liability. *See* 29 U.S.C. §1381 (title) ("withdrawal liability established"). Under that act, "if an employer withdraws from a multiemployer plan, it incurs 'withdrawal liability' in the form of a fixed and certain debt to the

pension plan." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 609 (1993). The first sentence of the MPPAA establishes "withdrawal liability" and provides for a withdrawal liability calculation in the event of either a "complete withdrawal" or a "partial withdrawal." 29 U.S.C. §1381(a). Other sections define "complete withdrawal" and "partial withdrawal" and distinguish between the two. 29 U.S.C. §§1381(b)(2)-(3).

The second sentence of the MPPAA describes a mathematical formula "[f]or purposes of" determining "withdrawal liability." 29 U.S.C. §1381(b)(1). It does so through cross-references to five different provisions found elsewhere in the statute: sections 1391, 1386, 1389, 1399(c)(1)(B), and 1405. 29 U.S.C. §1381(b)(1)(A-D).

The starting point is the "allocable amount of unfunded vested benefits," calculated under section 1391. That section sets forth several methods by which a plan shall determine "[t]he amount of the unfunded vested benefits allocable to an employer that withdraws from a plan[.]" 29 U.S.C. §1391(a).[1]

_____

[1] Before unfunded vested benefits can be allocated under section 1391, the plan must determine the value of the plan's unfunded vested benefits as a whole. "Unfunded vested benefits" means an amount equal to the

Once the withdrawing employer's proportionate share of unfunded vested benefits has been allocated under section 1391, section 1381(b) provides that "withdrawal liability" is "the amount determined under section 1391" (that is, "the allocable amount of unfunded vested benefits"), "adjusted" by the following four sections, in order: "first," 1389; "next," 1386; "then," 1399(c)(1)(B); and "finally" 1405. 29 U.S.C. §1381(b)(1)(A-D).[2] Each required adjustment to the allocable amount of unfunded vested benefits is briefly discussed below.

"First," section 1389 calls for a "reduction" to "the amount of the unfunded vested benefits allocable under section 1391 of this title[.]" 29 U.S.C. §1389(a). The parties agreed, and the District Court found, that this "de minimis rule" does not apply here. (Dkt. 44, p. 7)

"[N]ext," the second adjustment applies only "in the case of a partial withdrawal." 29 U.S.C. §1381(b)(1)(B). Thus, in determining a partial

---

value of nonforfeitable benefits under the plan less the value of the assets of the plan. 29 U.S.C. §1393(c).

[2] Because the allocable amount of unfunded vested benefits must be "adjusted" four ways before it becomes withdrawal liability, "an employer's withdrawal liability and allocable amount of unfunded vested benefits are *not synonymous*." *Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 802 F.3d 534, 546 (3rd Cir. 2015) (emphasis added).

withdrawal, an adjustment is made "in accordance with section 1386 of this title[.]" *Id*. On its face, section 1386(a) applies as the second adjustment to a partial withdrawal – it determines "[t]he amount of an employer's liability for a partial withdrawal, *before the application of sections 1399(c)(1) and 1405*" (the third and fourth adjustments), 29 U.S.C. §1386(a) (emphasis added), by reducing "the amount determined under section 1391 of this title, and adjusted under section 1389 of this title if appropriate" (the starting point and the first adjustment). This reduction of unfunded vested benefits accounts for the fact that the withdrawal being determined is partial, rather than complete. 29 U.S.C. §1386(a)(1).

This reduction occurs through the so-called "partial prorate fraction," which measures the decrease in the employer's "contribution base units" for the plan year after the partial withdrawal compared to the employer's average contribution base units for the five plan years before the partial withdrawal. 29 U.S.C. §1386(a)(2).[3] Because the Fund calculated and assessed Perfection's 2018 withdrawal "as a *complete*

_____

[3] "Contribution base unit" means a unit with respect to which an employer has an obligation to contribute. 29 U.S.C. §1301(a)(11). Here, the unit is weeks. (Dkt. 31-4, p. 6, 8)

*withdrawal*, and not a partial withdrawal," (Dkt. 14, ¶31) (emphasis added) the Fund did not apply section 1386(a) to that calculation.

Unlike the partial prorate fraction in section 1386(a), which reduces "the amount determined under section 1391 of this title," (*i.e.*, the allocable amount of unfunded vested benefits), 29 U.S.C. §1386(a)(1), the credit in section 1386(b) explicitly reduces "withdrawal liability." 29 U.S.C. §1386(b)(1) ("any *withdrawal liability* … in a subsequent plan year *shall be reduced* by the amount of any partial withdrawal liability … for a previous plan year.") (emphasis added). The central question in this case is whether the credit is to be applied at this step of the process (as an adjustment to the *allocable amount of unfunded vested benefits*) or at the completion of the adjustment process (as a reduction to the resulting *withdrawal liability*).[4]

After the second adjustment, "then" the third adjustment adjusts the allocable amount of unfunded vested benefits "to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B)

---

[4] As noted by the District Court, the prior partial credit in §1386(b)(1) "addresses a situation in which an employer partially withdraws from a plan and is assessed partial withdrawal liability, then in a later year partially or completely withdraws from the same plan and is again assessed withdrawal liability." (Dkt. 44, p. 9)

of this title[.]" 29 U.S.C. §1381(b)(1)(B). That section is colloquially known as the "20-year payment cap," because it caps an employer's liability at 20 level annual payments based on the employer's contribution history. 29 U.S.C. §1399(c)(1)(B).

Together, the maximum annual payment and maximum 20-year payment term "act[] as a ceiling on the amount of liability that an employer owes." S. 1076: The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 96th Cong., 2d Sess., p. 18 (Comm. Print 1980).[5] *See also Trustees of the Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 135 (2nd Cir. 2012) ("the MPPAA caps withdrawal liability such that in some cases the amount paid by withdrawing employers may not fully refund a pension plan."). Put differently, the 20-year cap requires a withdrawn employer to make annual payments to the plan for *the lesser of* (1) the number of

---

[5] The Senate Committee added that it "supports the combination of the 20-year cap with a periodic payment based on past contributions as a way of making both the maximum amount of liability and the annual amount required to be paid toward that liability easily predictable by employers." *Id.*

years it would take to satisfy its allocable amount of unfunded vested benefits, or (2) 20 years. 29 U.S.C. §1399(c)(1)(B).[6]

Except in the rare circumstance of a so-called "mass withdrawal," a withdrawn employer is never liable for any amount above the 20-year payment cap. *See* 29 U.S.C. §1399(c)(1)(D)(i-ii). There was no mass withdrawal here. (Dkt. 31-28, p. 44-45) (Dkt. 31-29, p. 87)

"[F]inally," section 1405 is the last adjustment in the determination of withdrawal liability. 29 U.S.C. §1381(b)(1)(D). Section 1405 adjusts "the unfunded vested benefits allocable to an employer" when the employer sells substantially all its assets to an unrelated third party or is undergoing liquidation or dissolution. 29 U.S.C. §§1405(a)-(b). It did not apply here. (Dkt. 33, p. 16)

The result of these four sequential adjustments to the allocable amount of unfunded vested benefits is "[t]he withdrawal liability of an employer[.]" 29 U.S.C. §1381(b)(1). That is, the adjustment process determines the "withdrawal liability" for which the employer "is liable" due to a partial or complete withdrawal. 29 U.S.C. §1381(a).

---

[6] "In the case of a partial withdrawal" the annual payment is also reduced by the same partial prorate fraction calculated for a partial withdrawal in the second adjustment. 29 U.S.C. §1399(c)(1)(E)(ii).

The MPPAA requires the plan to "determine the amount of the employer's *withdrawal liability*," 29 U.S.C. § 1382(1), and authorizes the plan to "collect the amount of the *withdrawal liability* from the employer." 29 U.S.C. §1382(3) (emphasis added). Nowhere does the statute authorize a plan to collect the allocable amount of unfunded vested benefits.[7]

Because the amount of an employer's withdrawal liability is the amount remaining after applying the four required adjustments to its allocable amount of unfunded vested benefits, Perfection's basic contention is that a credit that reduces *withdrawal liability* can only logically be applied after that *withdrawal liability* is calculated – that is, at the completion of the 4-step adjustment process.

The Fund candidly admits that "*withdrawal liability* and *unfunded vested benefits* are different things," (Dkt. 14, ¶6) (emphasis in original) and that it "applied the credit to which Perfection is entitled against

_____

[7] Again, except in a "mass withdrawal," which did not apply here. (Dkt. 31-29, p. 87) In a mass withdrawal, the statute explicitly states that the employer's liability "shall be determined … without regard to" the 20-year payment cap, and "the total unfunded vested benefits of the plan shall be fully allocated" among all employers involved in the mass withdrawal. 29 U.S.C. §1399(c)(1)(D)(i-ii).

Perfection's allocable unfunded vested benefits, rather than Perfection's subsequent withdrawal liability." (Dkt. 14, ¶43)

## C. Statement of the facts.

Perfection is a bakery in Fort Wayne, Indiana. It makes and distributes baked goods, breads, rolls, buns, etc. to customers throughout the Midwest. (Dkt. 14, ¶12, 27) Perfection operated facilities in Fort Wayne and Saginaw, Michigan, at which certain employees were represented by locals of the Retail, Wholesale and Department Store Union, and at each location was party to a collective bargaining agreement obligating it to contribute to the Fund. (Dkt. 14, ¶28)

In May of 2016, following negotiations between Perfection and its RWDSU local union, Perfection no longer had an obligation to contribute to the Fund for work performed at its Saginaw facility. (Dkt. 14, ¶29) The Fund determined that Perfection triggered a partial withdrawal and assessed Perfection withdrawal liability, which it calculated as a partial withdrawal, and not a complete withdrawal. (Dkt. 14, ¶30)

In determining the partial withdrawal, the Fund determined that the allocable amount of unfunded vested benefits for a complete withdrawal in 2016 would have been $17,369,394. (Dkt. 31-8, p. 1, 3) The

20-year payment cap limited the total amount for a complete withdrawal to $6,509,692, payable in annual payments of $594,000 (or $148,500 per quarter). (*Id.*) To repeat – had Perfection completely withdrawn in 2016, its total liability to the Fund would have been $6,509,692. (*Id.*)[8]

But because the 2016 withdrawal was partial, not complete, to determine the extent of the partial withdrawal, the Fund compared the contribution base units for the year following the partial withdrawal (2017), which were 129,880, to the average of 197,464 hours in the five years preceding the partial withdrawal. (Dkt. 31-8, p. 3) This resulted in a "partial withdrawal ratio" of .3423, (*Id.*), which means that the 2016 withdrawal resulted in a 34.23% partial withdrawal. (*Id.* at p. 1)[9]

As the same partial fraction also reduces the annual payment as part of the 20-year cap adjustment, Perfection's required annual payment for its 34.23 percent partial withdrawal decreased from $594,000 to $203,326 (or $50,832 per quarter). (Dkt. 31-8, p. 3) Thus, after the 20-year payment cap, Perfection's resulting partial withdrawal liability was

---

[8] (Dkt. 31-29, p. 103, 165) All figures are at present value. (*Id.* p. 82-83)

[9] In other words, in the year following its partial withdrawal Perfection continued to contribute at 65.77% (129,880/197,464 = .6577) of its prior level.

$2,228,268 – exactly 34.23% of what it would have been if the withdrawal were complete. (*Id.*) ($2,228,268 ÷ $6,509,692 = .3423)

In April 2018 Perfection experienced a complete withdrawal when it ceased having an obligation to contribute for work performed at its Fort Wayne facility. (Dkt. 14, ¶31) The Fund calculated this withdrawal "as a complete withdrawal, and not a partial withdrawal." (*Id.*)

Originally, the Fund applied the credit as Perfection contends it should have – it calculated the allocable amount of unfunded vested benefits as $17,331,978, then reduced this amount to $6,318,741 per the 20-year payment cap. (Dkt. 31-8, p. 5) The Fund then applied the prior partial credit (reduced per 29 C.F.R. §4206.6 from $2,228,268 to $1,432,238) to reduce the complete withdrawal liability from $6,318,741 to $4,886,504. (*Id.* at p. 2)[10]

---

[10] In the Arbitration, Perfection challenged the Fund's assertion that due to a supposed scrivener's error in its plan document, it was entitled to use a five-year amortization period to reduce the credit instead of the period of at least ten years called for by the plan document. (Dkt. 14, ¶9) The Arbitrator ruled in Perfection's favor and compelled the Fund to recalculate the credit. (*Id.*) (Dkt. 31-34, p. 44-45) Accordingly, the proper credit is $1,962,408. (*Id.*, p. 48) (Dkt. 44, p. 16-17) ("The parties agree that [Perfection's] 2016 partial withdrawal liability was $2,228,268 and that its partial withdrawal liability credit amounts to $1,962,408.")

Fund actuary Adam Condrick ("Fund Actuary") completed this calculation and provided it to the Fund on November 2, 2018. (Dkt. 31-8, p. 1) Normally, the Fund would have promptly sent the assessment to Perfection, but due to staffing changes and it being a busy time near year-end, the Fund failed to send out the original assessment. (Dkt. 31-28, p. 59-60) During a trustee meeting on December 10, 2018, the Fund Actuary learned of the Ninth Circuit's *Quad/Graphics* decision which had been issued a few days before, (Dkt. 31-29, p. 30) (Dkt. 31-27, p. 2) and shortly thereafter learned that the Fund had not yet issued the original assessments. (Dkt. 31-29, p. 60, 111)

At that Trustee meeting, the Fund trustees were told that while the *Quad/Graphics* decision "differs from prior PBGC guidance," it "would result in an increase in the assessable amount" for Perfection. (Dkt. 31-16, p. 2) They unanimously voted to have the Fund Actuary recalculate the 2018 complete withdrawal liability using the *Quad/Graphics* method. (*Id.*)

In the Fund Actuary's recalculation, the allocable amount of unfunded vested benefits remained $17,331,978, and the 20-year capped amount remained $6,318,741. (Dkt. 31-4, p. 8) However, rather than

applying the prior partial credit to reduce Perfection's complete *withdrawal liability*, this time the Fund Actuary instead applied the prior partial credit as an adjustment to *the allocable amount of unfunded vested benefits*, reducing that amount to $15,899,740. (*Id.*) Thus, after applying the 20-year payment cap, the Fund Actuary calculated the complete withdrawal liability as $6,318,741 – the same amount it would have been without the credit. (Dkt. 31-29, p. 123) The Fund issued its revised assessments in January 2019. (*Id.*, p. 112-113)

## D.     Course of proceedings below.

Perfection submitted a timely request for review (Dkt. 31-7) and timely initiated arbitration as to both assessments. (Dkt. 14, ¶ 32, 34) Ultimately, an arbitration was held ("Arbitration"). (Dkt. 14, ¶ 38)

### 1.     Arbitration testimony.

Only two witnesses testified at the Arbitration – the Fund administrator Sandi Mantooth ("Fund Administrator") and the Fund Actuary. In addition, the parties stipulated the admission in evidence of the report of Perfection's expert, Thomas Veal ("Veal Report"). (Dkt. 31-23, p. 5)

At the Arbitration, the Fund Administrator testified that the allocable amount of unfunded vested benefits is "distinct from withdrawal liability," (Dkt. 31-28, p. 55) "because it hasn't gone through any of the adjustments that are necessary to convert it to withdrawal liability[.]" (*Id.*, p. 73) She testified that Perfection's complete withdrawal liability had "not been reduced at all by the prior partial credit," because when the Fund applied the credit against the allocable amount of unfunded vested benefits, it was "taking the credit against an amount for which the employer was not responsible to pay[.]" (Dkt. 31-28, p. 71) The Fund Administrator also agreed that the Fund's application of the credit "didn't reduce the amount that Perfection owed the Fund even by a penny[.]" (Dkt. 31-28, p. 112)[11]

The Fund Actuary testified that to calculate withdrawal liability, one must first determine the total unfunded vested benefits for the plan and allocate a portion to the withdrawn employer. (Dkt. 31-29, p. 82) He agreed that "in essence," "you start with the allocable amount of unfunded vested benefits," and "then you have to apply fo[u]r

---

[11] Perfection included each of these points in its statement of material facts. (Dkt. 32, p. 13-14) The Fund did not dispute any of them. (Dkt. 40, p. 3)

adjustments … in order to calculate the actual withdrawal liability of an employer[.]" (Dkt. 31-29, p. 83)

Because one of the four adjustments is the 20-year payment cap, he agreed that "[w]ithout applying the 20-year payment cap, you don't have withdrawal liability," (*Id.*) and that any amounts above the 20-year payment cap "are not assessable by the Fund and they are not payable by the employer[.]" (*Id.* at 86)

The Fund Actuary also testified that in his more than 31-year career prior to this case, he had followed PBGC Opinion Letter 85-4 "every time" he calculated a credit, that he was never told anything different by his actuarial supervisors or colleagues, and "as far as [he] knew during that time, everybody at Segal was complying with the PBGC opinion[.]" (Dkt. 31-29, p. 62-64, 188) His original calculations here were also consistent with PBGC Opinion Letter 85-4. (*Id.*, p. 61)

The only reason the Fund Actuary remembered for the change in methods required by the Fund trustees was that there would be "an increase in the assessable amount" against Perfection. (Dkt. 31-29, p. 74) Thus, when *Quad/Graphics* came out, "Fund counsel and the trustees determined that there was more money to be had and they required [him]

to calculate the withdrawal liability consistent with that opinion," as opposed to the way he had previously done it. (Dkt. 31-29, p. 69)

The Fund Actuary further testified that "switching the method and taking the credit against the unfunded vested benefits" was "taking the credit against a number that Perfection was never obligated to pay," which in effect "turns the credit into a zero[.]" (Dkt. 31-29, p. 155) He agreed that calculated this way, the credit "didn't reduce at all the amount that Perfection would have to pay for the complete withdrawal," (*Id.*, p. 122) and admitted "Perfection would have owed $6,318,741 for the complete withdrawal, *even if there were no prior partial*" withdrawal. (*Id.*, p. 123) (emphasis added) The following exchange then took place:

> Q. In that sense, the prior partial withdrawal liability, which the Fund still expects Perfection to pay, correct?
>
> A. Correct.
>
> Q. In that sense, the $2,228,000 at present value that Perfection is tasked with paying under the partial doesn't count at all for reduction of the subsequent complete withdrawal, correct?
>
> A. In the amount owed, yes.
>
> Q. The amount they actually have to pay, correct?
>
> A. Yes.

Q. This only reduced the amount of unfunded vested benefits, which as you testified to, Perfection never had to pay that, correct?

A. Correct. (Dkt. 31-29, p. 123-124)[12]

The Fund Actuary agreed that by taking the credit in this new manner, "the Fund is benefiting because the credit here was entirely eaten up by amounts for which Perfection would have never been liable[.]" (Dkt. 31-29, p. 160) He also agreed that because the credit was based on the prior partial withdrawal liability and so had been limited by the 20-year payment cap, it was "inconsistent" to take that capped number against the allocable amount of unfunded vested benefits for the subsequent withdrawal, which had not been capped. (*Id.*, p. 156-157)

Finally, the Fund Actuary admitted that he "would interpret things in a way to get more money for the Fund" and if he "had two choices about how to calculate an item," he "would choose the one that gets the Fund more money[.]" (*Id.*, p. 67) He even admitted that if the Fund "could make

---

[12] In the Arbitration, the Fund admitted that "the amounts claimed by the Fund for Perfection's complete withdrawal assessment would have remained the same whether or not the Fund applied any credit resulting from Perfection's prior partial assessment," and "that the impact of Perfection's prior partial withdrawal liability credit on Perfection's complete withdrawal liability assessment was effectively zero." (Dkt. 14, ¶45-46)

more money doing it the old way, the way that [he] did it for 31 years," he would still do it that way, (*Id.*, p. 168) (*See* Dkt. 31-2, p. 113) consistent with his belief that he "should do everything in [his] power to see to it that the Fund gets more money[.]" (Dkt. 31-29, p. 168)[13]

As for Veal, for nearly four years in the mid-1980s he directed the PBGC's Corporate Policy and Regulations Department which was "responsible for all regulations and guidance concerning the PBGC's multiemployer plan program, the principal element of which was withdrawal liability." (Dkt. 31-11, p. 1) After leaving the PBGC, Veal spent 22 years with Deloitte Tax LLP, and since 2009 has been with Steptoe & Johnson LLP as senior counsel. (*Id.*, p. 1) As Acting Director of the Legal Department, Veal signed PBGC Op. Ltr. 85-4. (*Id.*, p. 2)

In the Veal Report, Veal applied the credit called for by 29 U.S.C. §1386(b)(1) to reduce the subsequent complete withdrawal liability, which would reduce the amount for which Perfection was liable to $4,886,503.00. (*Id.*, p. 4) Veal's calculations matched the original

---

[13] The Fund Actuary admitted that his actuarial firm has no policy on calculating the credit and that he does not have to abide by the Ninth Circuit opinion he followed here. (Dkt. 31-29, p. 66, 75)

calculations of the Fund Actuary. (Dkt. 31-8, p. 2, 5)[14] Veal disregarded *Quad/Graphics* because, *inter alia*, section 1381(b)(1)(B) "applies only 'in the case of a partial withdrawal.' Hence, unless one rewrites the legislative text, it has no application to calculating liability for a complete withdrawal, which is what is at issue here." (Dkt. 31-11, p. 5)

### 2. Arbitration award.

In his Opinion and Award, the arbitrator noted that section 1381(b)(1) "specifies that withdrawal liability equals the employer's allocable unfunded vested benefits after making four adjustments in sequential order," and that "no dispute exists between the parties as to this structure for computing withdrawal liability." (Dkt. 1-1, p. 35) Despite this, the arbitrator allowed the Fund to apply the prior partial credit to adjust Perfection's allocable amount of unfunded vested benefits rather than to reduce its withdrawal liability, and further found that the PBGC Opinion Letter 85-4 was not "due deference." (*Id.*, p. 40-41) The arbitrator also held that the phrase "in the case of a partial withdrawal" "encompasses both a current partial withdrawal and the situation here,

---

[14] The Fund Actuary testified that the one-dollar difference in amounts was likely due to rounding and "not material." (Dkt. 31-29, p. 153-54)

namely, a current complete withdrawal for which a prior partial withdrawal liability credit must be applied." (*Id.*, p. 36-37)

Perfection filed a timely action to vacate the arbitrator's opinion and award. (Dkt. 1)

### 3. District Court opinion.

Although it found "a significant part" of the Ninth Circuit's reasoning in *Quad/Graphics* "unpersuasive," (Dkt. 44, p. 21) the District Court upheld the arbitrator's decision and the Fund's determination. The Court acknowledged that "[a]t first glance," the phrase "in the case of a partial withdrawal" appeared "to limit application of the adjustment to situations in which a plan sponsor is calculating an employer's liability for a partial withdrawal, thereby excluding situations in which the employer's withdrawal is complete." (Dkt. 44, p. 22-23) However, the Court reasoned that because section 1381(b)(1)(B) refers to "section 1386" instead of "section 1386(a)" specifically, "Congress's decision to incorporate all of § 1386 was deliberate[.]" (*Id.*, p. 23)

The Court thus rejected Perfection's argument that the statutory definition of "partial withdrawal" cannot encompass a complete withdrawal and ruled that interpreting "in the case of a partial

withdrawal" to "trigger application of the adjustment whenever a partial withdrawal *has occurred* or *is occurring* is consistent with the plain language of § 1381(b)(1)(B) and the MPPAA as a whole." (*Id.*, p. 26) The Court also reasoned that Perfection's interpretation "could lead to a situation where the credit cannot be applied at all." (*Id.*)

The Court noted that because section 1405 states that "the unfunded vested benefits allocable to an employer (*after the application of all sections of this part having a lower number designation than this section*) . . . shall not exceed" certain amounts, (Dkt. 44, p. 24) and section 1381(b)(1)(D) refers to this adjustment as "final," section 1405 "requires application of *all* of § 1386 before the fourth potential adjustment can be applied." (*Id.*)

## III.   STANDARD OF REVIEW

In withdrawal liability matters, a federal court reviews the arbitrator's legal conclusions *de novo*. *Trustees of Cent. Pen. Fund v. Wolf Crane Service*, 374 F.3d 1035, 1038 (11th Cir. 2004). Because the only dispute here is about the proper construction of the statute, this Court's review is also *de novo*. *Id.*

# IV.   SUMMARY OF THE ARGUMENT

The District Court's interpretation is contrary to the text of the MPPAA, contrary to the opinion and regulations of the federal agency charged with overseeing Title IV of ERISA, and contrary to the purpose of the credit.

The statutory text requires the prior partial credit to reduce "withdrawal liability," 29 U.S.C. §1386(b)(1), and it is undisputed here that did not happen. (Dkt. 14, ¶43) ("the Fund applied the credit to which Perfection is entitled against Perfection's allocable unfunded vested benefits, rather than Perfection's subsequent withdrawal liability.") In addition, the second adjustment to the allocable amount of unfunded vested benefits applies only "in the case of a partial withdrawal," and it is undisputed that, contrary to the text, the Fund applied this step to a complete withdrawal. (Dkt. 14, ¶31)

As a matter of pure statutory construction, the District Court's interpretation is wrong. But even if the statutory text were not plain, the PBGC has rejected as "clearly erroneous" the method used here and its promulgated regulations make clear that the credit must reduce the amount otherwise payable. *See* PBGC Op. Ltr. 85-4; 29 C.F.R. § 4206.1;

and §4206.3. Finally, as a practical and policy matter, the method endorsed by the District Court would render the credit illusory.

## V.   ARGUMENT

The District Court erred in concluding that the credit in 1386(b) must be applied not against Perfection's withdrawal liability for its complete withdrawal 2018, but rather as an intermediate step of the process for calculating its "withdrawal liability" for that year. That conclusion was contrary to the plain text of the statute, which requires consideration of 1386 during the withdrawal-liability calculation process only "in the case of a partial withdrawal." It also made no sense, because as a practical matter, it resulted in Perfection receiving no credit at all for the partial withdrawal from 2017. The PGBC rejected this interpretation of the statute, and this Court should do so as well.

## A.   The District Court's interpretation is contrary to MPPAA's text.

First, contrary to the term "withdrawal liability" in section 1386(b)(1), the Fund applied the prior partial credit to adjust Perfection's *allocable amount of unfunded vested benefits*, rather than to reduce its *withdrawal liability*. Second, contrary to the words "in the case

of a partial withdrawal" in section 1381(b), the Fund applied the second adjustment to a complete withdrawal.

### 1. The District Court's interpretation is contrary to the term "withdrawal liability" in 1386(b)(1).

a. A withdrawn employer is only liable for "withdrawal liability," and a plan may only collect "withdrawal liability."

If an employer withdraws from a plan, the amount for which it "is liable" is known as "withdrawal liability." 29 U.S.C. §1381(a). Absent a mass withdrawal (not present here), this amount is the only amount a plan is authorized to "collect" from the employer as a result of a partial or complete withdrawal. 29 U.S.C. §1382(3).

"When an employer withdraws," the MPPAA requires the plan to "determine the amount of the employer's withdrawal liability[.]" 29 U.S.C. §1382(1). A plan accomplishes this by first calculating "[t]he amount of the unfunded vested benefits allocable" to the employer, consistent with one of the methods established under section 1391. 29 U.S.C. §1391(a). "For purposes of" determining the employer's "withdrawal liability," *that amount* ("the amount determined under section 1391 … to be the allocable amount of unfunded vested benefits") is "adjusted" by a series of four potential adjustments. 29 U.S.C.

§1381(b)(1). The amount remaining *after* applying the four statutory adjustments is the employer's "withdrawal liability," *id.*, and the MPPAA authorizes a plan to "collect" that amount. 29 U.S.C. §1382(3).[15]

Courts assume that where Congress used two terms, "it intended each term to have a particular, non-superfluous meaning." *Bailey v. United States*, 516 U.S. 137, 146 (1995). *See also United States v. Pate*, 84 F.4th 1196, 1203 (11th Cir. 2023) ("when Congress uses different language in similar sections, it intends different meanings."). Accordingly, the terms *allocable amount of unfunded vested benefits* and *withdrawal liability* cannot be construed to have the same meaning. *Id.*

In construing the same section at issue here, the Third Circuit specifically noted the fundamental difference between those terms. In *C&S Wholesale Grocers*, after quoting in full the language of section 1381(b)(1) and emphasizing that the allocable amount of unfunded vested benefits must be "adjusted" to become withdrawal

---

[15] The District Court acknowledged this fundamental difference between the allocable amount of unfunded vested benefits and withdrawal liability. (Dkt. 44, p. 7) ("After calculating the allocable amount of unfunded vested benefits, the plan sponsor then applies four potential adjustments to that number, in sequential order, to reach the employer's withdrawal liability."). However, it failed to recognize that its decision applied the credit before the withdrawal liability had been "reached."

liability, that Court explained: "In other words, an employer's withdrawal liability and allocable amount of unfunded vested benefits are *not synonymous.*" *C&S Wholesale Grocers*, 802 F.3d at 546 (emphasis added). Despite the intrinsic difference between the allocable amount of unfunded vested benefits and withdrawal liability, the District Court's ruling erroneously treats the two terms as equivalent.[16]

     b.    Section 1386(b)(1) calls for the credit to reduce "withdrawal liability," not "the allocable amount of unfunded vested benefits."

The fundamental difference between the allocable amount of unfunded vested benefits and withdrawal liability is at the heart of this case because section 1386(b)(1) does not provide for the credit to adjust *the allocable amount of unfunded benefits;* it provides for the credit to reduce "any *withdrawal liability* of that employer . . . in a subsequent plan year." 29 U.S.C. §1386(b)(1). Because the credit reduces "withdrawal

---

[16] In promulgating the governing regulations, the PBGC acknowledged that *due to the required adjustments* an employer's withdrawal liability might be less than the allocable amount of unfunded vested benefits. *See* "Adjustment of Liability for a Withdrawal Subsequent to a Partial Withdrawal," 52 Fed. Reg. 37329, 37331 (Oct. 6, 1987) (noting "the fact that the employer's assessment for its prior partial withdrawal might have been less than its allocable liability for that withdrawal because of the *de minimis* rule or the 20-year payment cap[.]").

liability," and "withdrawal liability" does not exist until after the four necessary adjustments have been applied to the allocable amount of unfunded vested benefits, 29 U.S.C. §1381(b)(1), the credit cannot be applied until that process is finished. 29 U.S.C. §1386(b)(1).

Consistent with this point, the language of section 1386(b)(1) calling for the credit to reduce "withdrawal liability" is significantly different than the language in each of the four adjustments. In fact, each of the adjustments by its terms applies to the *allocable amount of unfunded vested benefits*. In addition, each adjustment also references the other adjustments, showing where that adjustment fits in the sequence called for under the statute.

For example, the "first" adjustment is section 1389. 29 U.S.C. §1381(b)(1)(A). Section 1389 states that "the *amount of the unfunded vested benefits allocable under section 1391* of this title … shall be reduced" by a "de minimis" reduction. 29 U.S.C. §1389(a) (emphasis added).

The second adjustment calls for an adjustment "in the case of a partial withdrawal, in accordance with section 1386[.]" 29 U.S.C. §1381(b)(1)(B). In turn, section 1386(a) states "the *amount determined*

*under section 1391 of this title*, and adjusted under section 1389 of this title, if appropriate," multiplied by a fraction (to account for the fact that the withdrawal is partial, not complete) is equal to "[t]he amount of an employer's liability for a partial withdrawal, before the application of sections 1399(c)(1) and 1405 of this title[.]" 29 U.S.C. §1386(a)(1) (emphasis added).[17]

The third adjustment applies "to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title[.]" 29 U.S.C. §1381(b)(1)(C). Like the others, that adjustment applies to "*the amount determined under section 1391 of this title*, adjusted if appropriate under section 1389 of this title and then under section 1386 of this title," not to withdrawal liability. 29 U.S.C. § 1399(c)(1)(A)(i).

Finally, the fourth adjustment applies "in accordance with section 1405 of this title." 29 U.S.C. §1381(b)(1)(D). In turn, section 1405 limits "*the unfunded vested benefits allocable to an employer* (after application

---

[17] Notably, while section 1386(a) refers to section 1391, section 1389, section 1399(c)(1) and section 1405, it fails to mention the prior partial credit in section 1386(b)(1). 29 U.S.C. §1386(a)(1). Section 1386(a)'s failure to reference the credit in section 1386(b) despite referencing every other adjustment is consistent with Perfection's argument that the credit does not apply in the second adjustment. The Fund has never explained why the credit is not mentioned here.

of all sections of this part having a lower number designation than this section)[.]" 29 U.S.C. §1405(a)(1) (emphasis added). Section 1405(b) also speaks solely in terms of limiting "*the unfunded vested benefits allocable to the employer*[.]" 29 U.S.C. §§1405(b)(1)-(2) (emphasis added).

Thus, by their terms, each of the four required adjustments applies to the *allocable amount of unfunded vested benefits* (sometimes called "the amount determined under section 1391"). 29 U.S.C. §1389(a); § 1386(a)(1); § 1399(c)(1)(A)(i); and § 1405(a)(1). In sharp contrast, section 1386(b)(1) applies to reduce *withdrawal liability*. 29 U.S.C. §1386(b)(1).

This Court should give effect to Congress's decision to use materially different terms, and apply the credit to reduce withdrawal liability, rather than the allocable amount of unfunded vested benefits. *Pate*, 84 F.4th at 1203 ("when Congress uses different language in similar sections, it intends different meanings.").

    c.    The District Court failed to give effect to the substantive difference between the "allocable amount of unfunded vested benefits" and "withdrawal liability."

The District Court rejected Perfection's argument that the partial credit must reduce withdrawal liability because, among other things,

§1381(b)(1)(B) states that the adjustment "in the case of a partial withdrawal" is to be made "in accordance with section 1386," rather than "section 1386(a)" alone. 29 U.S.C. §1381(b)(1)(B). But that is not the best reading of the phrase "in accordance with section 1386."

To begin with, because the credit is based on "the amount of any partial withdrawal liability … for *a previous plan year*," 29 U.S.C. §1381(b)(1)(B), applying it as part of the second adjustment requires consideration of the *prior* partial withdrawal liability, rather than a straightforward calculation of the withdrawal liability for a *current* withdrawal.

But section 1381(b)(1) exists "[f]or purposes of" determining the "withdrawal liability" from a *current* withdrawal. 29 U.S.C. §1381(b). Accordingly, section 1381(b)(1) calculates the withdrawal liability *for a given year*, while the credit's reduction to withdrawal liability occurs "in a *subsequent* plan year[.]" 29 U.S.C. §1386(b)(1) (emphasis added). Thus, when calculating a current withdrawal liability, there is only a *single withdrawal* at issue, either partial or complete. 29 U.S.C. §1381(a). Introducing a second, previously calculated partial withdrawal into the

calculation conflicts with the statutory language, which repeatedly references only a *single* withdrawal as part of the calculation.

For example, section 1391 requires the plan to first determine the amount of unfunded vested benefits allocable to an employer that withdraws and repeatedly refers to "*the* withdrawal," singular. *See* 29 U.S.C. §1391(b)(2)(A)(ii) (calling for the plan to allocate unfunded vested benefits for each plan year ending "before the plan year in which *the withdrawal* of the employer occurs."); and 29 U.S.C. §1391(c)(3)(B) (fraction numerator based on "total amount required to be contributed by the employer … for the last 5 plan years ending before *the withdrawal*" and denominator based on "total amount contributed … by all employers for the last 5 plan years ending before *the withdrawal*") (emphases added). Section 1391's references to a single withdrawal are consistent with the fact that only one withdrawal – the current withdrawal being calculated – is at issue during the calculation.

Likewise, the partial fraction in section 1386(a) twice references "the plan year in which *the partial withdrawal* occurs[.]" 29 U.S.C. §1386(a)(2)(A), (a)(2)(B)(i). Another section speaks of "the date of *the partial withdrawal*[.]" 29 U.S.C. §1386(a)(1)(A) (emphasis added). Each

of these provisions would be unclear if there were two partial withdrawals (both prior and current) at issue.

Finally, the calculation of the annual payment pursuant to the third adjustment repeatedly references "the plan year in which *the withdrawal* occurs," something that would make no sense if there were also at issue a withdrawal from a prior plan year. *See* 29 U.S.C. §1399(c)(1)(A)(i), (c)(1)(C)(i)(I) & (II), (c)(1)(C)(ii)(I).

The fact that these required adjustments each assume only a single withdrawal further supports Perfection's argument that the calculation of a *current* withdrawal does not include a *previously calculated* prior partial withdrawal. Rather than incorporating the credit as part of the calculation (a bit like treating a tax credit as a tax deduction), after a plan calculates the withdrawal liability arising from a current withdrawal for a given plan year, it must reduce that withdrawal liability by the amount of any pre-existing withdrawal liability the employer has from a previous plan year. *See* 29 U.S.C. §1386(b)(1) ("withdrawal liability … in a *subsequent plan year* shall be reduced by … partial withdrawal liability … *for a previous plan year*.") (emphasis added).

Rather than follow the simple words of the statute, the District Court reverse engineered the second adjustment by focusing on the subordinate clause "in accordance with section 1386" – but that clause only applies "in the case of a partial withdrawal[.]" 29 U.S.C. §1381(b)(1)(B). So "in the case of a complete withdrawal," there is no need to proceed to section 1386. This does not mean that the credit does not apply, it means the credit is applied only at the end of the process, and whether the withdrawal liability is *partial or complete*, exactly as the statute says. 29 U.S.C. §1386(b)(1) (reduction applies to "any withdrawal liability of that employer *for a partial or complete withdrawal*") (emphasis added).

This reading harmonizes the statute by applying the partial fraction in section 1386(a)(1) as part of the second adjustment only "in the case of a partial withdrawal," as the text states, and applying the prior partial credit in section 1386(b)(1) to reduce the amount *of a partial or complete* withdrawal liability once that amount has been determined, as its text states. *See Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, 734 F.3d 1297, 1302 (11th Cir. 2013) ("the fundamental canon of statutory construction is that the words of a statute must be

read in their context and with a view to their place in the overall statutory scheme and that a court should fit, if possible, all parts into a harmonious whole.").

It is also consistent with the rule that "cross-references are read in conjunction with the provision being interpreted." *MSPA Claims v. Tenet Florida, Inc.*, 918 F.3d 1312, 1322 (11th Cir. 2019) ("courts should not dig through layers of cross-references and then use what they have unearthed to replace the text of the provision right in front of them."). The only "adjustment" in §1386 that *always* applies "in the case of a partial withdrawal," and *never* applies to a complete withdrawal is section 1386(a). Rather than "withdrawal liability," that section adjusts "the amount determined under section 1391," 29 U.S.C. §1386(a)(1), which is easily and naturally read in conjunction with section 1381(b)(1), which alsorequires adjustments to "the amount determined under section 1391[.]" 29 U.S.C. §1381(b)(1).

The partial fraction in section 1386(a) also twice uses the identical phrase "in the case of a partial withdrawal," 29 U.S.C. §1386(a)(1)(A), (a)(2)(B)(ii), exactly tracking the phrasing of 29 U.S.C. §1381(b)(1)(B). In contrast, the prior partial credit in 29 U.S.C. §1386(b)(1) does not use the

phrase "in the case of a partial withdrawal," but instead applies "[i]n the case of an employer *that has withdrawal liability* for a partial withdrawal from a plan[.]" *Id.* (emphasis added). These material differences in language further support Perfection's argument. *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, p. 170 (2012) ("a material variation in terms suggests a variation in meaning.").

> d. The District Court erred in holding that §1405's "final" adjustment to the allocable amount of unfunded vested benefits precluded any reduction to withdrawal liability.

The District Court wrongly inferred that because the §1405 adjustment is the "final" adjustment, the credit cannot be applied after that. (Dkt. 44, p. 24) But this again ignores the fact that adjustments under section 1381(b)(1) apply to the *allocable amount of unfunded benefits* and are necessary to determine the amount of *withdrawal liability*. 29 U.S.C. §1381(b)(1). Section 1386(b)(1) by its terms applies to reduce "withdrawal liability," which can only happen after the withdrawal liability is determined.

Again, "an employer's withdrawal liability and allocable amount of unfunded vested benefits are not synonymous," *C&S Wholesale Grocers*,

802 F.3d at 546, and section 1386(b) does not set out an "adjust[ment]" to the allocable amount of unfunded vested benefits; it sets out a "reduc[tion]" to "withdrawal liability." 29 U.S.C. §1386(b)(1). So §1381(b)(1)(D)'s specification that §1405 sets out the "final[]" adjustment to "the allocable amount of unfunded vested benefits" does not preclude §1386(b)(1) from reducing the "withdrawal liability" that only exists after that final adjustment.

In fact, courts have held that "a fund's determination of withdrawal liability under Section 1381 necessarily takes into consideration" the section 1405 adjustment "[b]ecause issues under Section 1405 are part of the calculus for determining withdrawal liability under Section 1381[.]" *Central States v. Johnco, Inc.*, 694 F.Supp 478, 480-81 (N.D. Ill. 1988). *See also Bd. of Trustees, Sheet Metal Workers' National Pension Fund v. BES Services, Inc.*, 469 F.3d 369, 373 (4th Cir. 2006) ("any determination of withdrawal liability under §1381 *must* take into consideration an employer's sale of assets or insolvency under §1405.") (emphasis in original). "Indeed, a §1381 determination of withdrawal liability cannot

be accomplished in accordance with the statutory mandate unless it is 'adjusted' in accordance with §1405." *BES Services*, 469 F.3d at 373.[18]

In fact, the language of section 1405 supports Perfection's argument, as it establishes that the "final" adjustment in §1405 adjustment limits "the unfunded vested benefits allocable to an employer after the application of all [prior] sections," 29 U.S.C. §1405(a)(1), which necessarily means that every preceding adjustment also adjusts the allocable amount of unfunded vested benefits (as they each state).[19]

For the same reasons, the District Court was wrong to suggest that Perfection's interpretation could "lead to a situation where the credit cannot be applied at all." (Dkt. 44, p. 26) To the contrary, while it is true that the section 1405 adjustment is the "final" adjustment, *see* 29 U.S.C.

---

[18] Counsel raised this point at oral argument before Judge Axon. (Dkt. 50, p. 13-14)

[19] Notably, the MPPAA allows a plan to "reallocate" any amounts it is prevented from assessing pursuant to the adjustments to the allocable amount of unfunded vested benefits. 29 U.S.C. §1391(b)(4)(B)(ii) ("reallocated unfunded vested benefits" includes "any amount which the plan sponsor determines ... *will not be assessed* as a result of the operation of section 1389, 1399(c)(1)(B), or 1405") (emphasis added). If the credit in section 1386(b) likewise applied to reduce the allocable amount of unfunded vested benefits, Congress would surely have allowed a plan to reallocate those amounts, too – so the absence of section 1386 from this provision speaks volumes.

§1381(b)(1)(D), it is the "final" adjustment to the *allocable amount of unfunded vested benefits*. 29 U.S.C. §1381(b)(1). So the section 1405 adjustment completes the process of calculating *withdrawal liability* which constitutes the amount for which the employer "is liable[.]" 29 U.S.C. §1381(a). At that point, the credit can be applied to reduce *that amount* (the "withdrawal liability"), as the statute states. 29 U.S.C. §1386(b)(1).

In sum, because the credit reduces "withdrawal liability," and the amount of "withdrawal liability" is not determined until all four adjustments set forth in §1381(b)(1)(A-D) have been applied to the allocable amount of unfunded vested benefits, the credit can be taken only after that point. Only this interpretation applies the credit to *withdrawal liability*, as Congress instructed. *Autauga County Emergency Mgmt. Communication Dist. v. FCC*, 17 F.4th 88, 99 (11th Cir. 2021) ("we presume that Congress said what it meant and meant what it said").

2. **The District Court's interpretation also is contrary to the words "in the case of a partial withdrawal" in §1381(b)(1)(B).**

As noted above, the second adjustment applies only "in the case of a partial withdrawal[.]" 29 U.S.C. §1381(b)(1)(B). Despite this explicit

limitation, it is undisputed that the Fund applied the second adjustment in the case of a *complete* withdrawal. (Dkt. 14, ¶31) This was contrary to the language of the statute.

> a. Construing "in the case of a partial withdrawal" to include a complete withdrawal is not the most natural reading of the statute.

The most natural reading of the words "in the case of a partial withdrawal" refers to the particular withdrawal for which the withdrawal liability is being calculated. That reading is confirmed by §1381(a), which states that this part of the statute "determine[s]" "the withdrawal liability" for either "a complete withdrawal *or* a partial withdrawal." 29 U.S.C. §1381(a) (emphasis added). It is further confirmed by section 1381(b) which states that the formula set forth in §1381(b)(1) is "[f]or purposes of subsection (a)" – that is, "for purposes of" determining the withdrawal liability for which an employer is liable when it withdraws. 29 U.S.C. §1381(b).

Because §1381(b) exists "for purposes of" determining the withdrawal liability arising from a particular withdrawal, and there are only two types of withdrawals, a withdrawal must be *either* a complete withdrawal *or* a partial withdrawal. 29 U.S.C. §1381(a). The first, third

and fourth adjustments do not limit their application in any way, and no one disputes those adjustments apply to either a complete or partial withdrawal. 29 U.S.C. §1381(b)(1)(A), (C), (D).

In stark contrast, the second adjustment applies "in the case of a *partial withdrawal*" alone. 29 U.S.C. §1381(b)(1)(B) (emphasis added). By instructing plans to apply this adjustment to a partial withdrawal, Congress implicitly, but deliberately, instructed plans *not* to apply it in the case of a complete withdrawal. *See Estate of Cummings v. Davenport*, 906 F.3d 934, 942 (11th Cir. 2018) (noting the "familiar canon that the expression of one thing implies the exclusion of others."), *citing* READING LAW, p. 107.

This rule applies with particular force here because construing the phrase "in the case of a partial withdrawal" to include a withdrawal the Fund admits is *not a partial withdrawal* (Dkt. 14, ¶31) impermissibly ignores the text of the statute. *See* READING LAW, p. 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). It also ignores the reality that partial and complete withdrawals are mutually exclusive. *See GCIU-Emp'r Ret.*

*Fund v. MNG Enters., Inc.*, 51 F.4th 1092, 1098 (9th Cir. 2022) (noting that Black's Law Dictionary defines "partial" as "not complete").

Despite this, the District Court held that the phrase "in the case of a partial withdrawal" means "whenever a partial withdrawal *has occurred* or *is occurring*[.]" (Dkt. 44, p. 26) (emphasis by Court) While this may sound plausible, as shown by this case, in effect it includes the calculation of a *complete withdrawal* – the very thing excluded by Congress. 29 U.S.C. §1381(b)(1)(B).

At any rate, it makes no sense to speak of a partial withdrawal that "has occurred or is occurring," because *in every instance* a partial withdrawal "has occurred" prior to its calculation, and there is no instance where a partial withdrawal "is occurring" at the time of its calculation. In fact, a partial withdrawal cannot be calculated until at least one full plan year has passed after the partial withdrawal has occurred, because only then can the plan determine the full impact. 29 U.S.C. §1386(a)(2)(A) (the numerator of the fraction "is the employer's contribution base units for the plan year *following the plan year in which the partial withdrawal occurs*") (emphasis added).

Moreover, no other reference to "partial withdrawal" in the MPPAA can be plausibly interpreted to include a "complete withdrawal." Indeed, every time Congress used both terms, it invariably separated them by the conjunction "or." *See* 29 U.S.C. §1381(a); §§1384(a)(1), (a)(1)(C); §1390(a); and §§1401(e)(1)(A), (e)(1)(C), (f)(1)(A) & (f)(1)(B). This further establishes that the terms are mutually exclusive – a partial withdrawal is not a complete withdrawal, and vice versa.

And because "[a] word or phrase is presumed to bear the same meaning throughout a text," *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019), *quoting* READING LAW, p. 170, the phrase "partial withdrawal" cannot be deemed to include a complete withdrawal in this single instance. *Regions Bank*, 936 F.3d at 1192 ("Properly applied, [the whole-text canon] typically establishes that only one of the possible meanings that a word or phrase can bear is compatible with use of the same word or phrase elsewhere in the statute."). At the very least, such a reading is not the best reading of the statute. *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 937 (11th Cir. 2023) (Jordan, J., concurring) ("an identical term used in the same statute is presumed to have the same meaning throughout.").

In fact, applying both subsections of 1386 to the second adjustment causes the phrase "in the case of a partial withdrawal" to bear distinct and inconsistent meanings as applied to each subsection. Under the Fund's reading, in §1386(a) the phrase must refer to *the current partial withdrawal being calculated*, but in §1386(b)(1), the same phrase must refer to a *separate pre-existing partial withdrawal liability*. That the same phrase means different things from one subsection to the next is good evidence that the construction is unsound. *See Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1159 (11th Cir. 2021) ("It would be odd if, in two consecutive subsections of the Code . . . the same words were read to mean one thing in the first subsection but another in the second.").

b. Construing "in the case of a partial withdrawal" to include a complete withdrawal impermissibly ignores the statutory definitions.

That a partial withdrawal may not be construed to include a complete withdrawal is further supported by the fact that Congress specifically defined both of those phrases and chose to limit the second adjustment to apply "in the case of a partial withdrawal" only. 29 U.S.C. §1381(b)(1)(B).

Congress defined the term "partial withdrawal" as meaning "a partial withdrawal described in section 1385 of this title." 29 U.S.C. §1381(b)(3). Accordingly, the second adjustment applies only where a plan is determining the withdrawal liability arising from a partial withdrawal *described in section 1385. Id*. But section 1385 says nothing at all about the prior partial credit. 29 U.S.C. §1385.

The District Court acknowledged that section 1385 "does not mention the credit," (Dkt. 44, p. 25) but nonetheless expanded the definition of "partial withdrawal" to include the partial withdrawal *credit*, which is described in section 1386, *not* in section 1385. 29 U.S.C. § 1386(b)(1). This was error. *See U.S. v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Definition sections in statutes are to be carefully followed."); and *Stansell v. Revol. Armed Forces of Col.*, 704 F.3d 910, 915 (11th Cir. 2013) ("statutory definitions control the meaning of a statute's terms").

Moreover, Congress also defined the phrase "complete withdrawal," 29 U.S.C. § 1381(b)(2), and chose to limit the second adjustment to apply only "in the case of a partial withdrawal." 29 U.S.C. §1381(b)(1)(B). Because of this, the second adjustment cannot apply in the case of a complete withdrawal (as defined by Congress). *Polycarpe v. E & S*

*Landscaping Serv.*, 616 F.3d 1217, 1222-23 (11th Cir. 2010) (courts disfavor any construction that would cause an overlap with another defined term).

In sum, the Fund's method radically and impermissibly enlarges the statutory definition of "partial withdrawal" to include a situation where (as here) a plan is calculating a *complete withdrawal*. (Dkt. 14, ¶31) This is prohibited. *Burgess v. United States*, 553 U.S. 124, 130 (2008) ("As a rule, a definition which declares what a term 'means' excludes any meaning that is not stated."); and READING LAW, p. 226 ("When … a definitional section says that a word 'means' something, the clear import is that this is its *only* meaning.") (emphasis in original).

> c. Construing "in the case of a partial withdrawal" to include a complete withdrawal is inconsistent with the usage of that phrase elsewhere in the MPPAA.

As noted above, "a word or phrase is presumed to bear the same meaning throughout a text." READING LAW, p. 170. The ruling below violates this canon of consistent usage because no other statutory use of the phrase "in the case of a partial withdrawal" has application to a complete withdrawal.

For example, section 1386(a) twice uses the phrase "in the case of a partial withdrawal" to refer exclusively to a partial withdrawal. 29 U.S.C. §1386(a)(1)(B) and (a)(2)(B)(ii) (each describing the calculation for a partial withdrawal based on a 70% contribution decline). More importantly, as part of the third adjustment, 29 U.S.C. §1381(b)(1)(C), the statute requires the annual payment to be reduced by the partial reduction fraction "[i]n the case of a partial withdrawal[.]" 29 U.S.C. §1399(c)(1)(E) (annual payment "shall be the product of" the annual payment for a complete withdrawal multiplied by "the fraction determined under section 1386(a)(2)[.]").

Had the Fund applied the reduction fraction from the prior partial withdrawal, it would have reduced Perfection's annual payment from $576,576 to $197,361.96). ($576,576 x .3423 = $197,361.96) Of course, the Fund did not reduce Perfection's annual payment in this manner. (Dkt. 31-4, p. 5, 8) (no reduction to the annual payment)

But either the phrase "in the case of a partial withdrawal" includes a complete withdrawal or it doesn't – the Fund should not be permitted to have it both ways, construing the phrase expansively to shoehorn the prior partial credit into the second adjustment, but construing the phrase

narrowly in the very next adjustment to avoid reducing Perfection's annual payment. *See U.S. v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) ("identical words used in different parts of the same statute are generally presumed to have the same meaning").[20]

d. Construing "in the case of a partial withdrawal" to include a complete withdrawal renders the phrase both duplicative and superfluous.

Construing the phrase "in the case of a partial withdrawal" to include a complete withdrawal renders the phrase duplicative and superfluous. It is duplicative because it interprets "partial withdrawal" to include a complete withdrawal, itself a defined term. 29 U.S.C. §§ 1381(b)(2), (3). This is highly disfavored. *See* READING LAW, p. 174 (no word or provision "should needlessly be given an interpretation that causes it to duplicate another"). If Congress intended to include the

---

[20] The Fund may object that it did not calculate a partial reduction fraction under section 1386(a)(2) when calculating the complete withdrawal. But that's the whole point – the calculation of a partial withdrawal *always* generates a fraction that reduces both the allocable amount of unfunded vested benefits and the required annual payment. *See* 29 U.S.C. §1386(a)(2), and 29 U.S.C. §1399(c)(1)(E). That neither of these things occurred as part of the Fund's calculation of Perfection's complete withdrawal is further evidence that the phrase "in the case of a *partial* withdrawal" is stretched too far when it is allowed to include a *complete* withdrawal.

calculation of a complete withdrawal in the second adjustment, "it could have easily said so." *In re Witcher*, 702 F.3d 619, 622 (11th Cir. 2012). It did not. 29 U.S.C. §1381(b)(1)(B).

In addition, the Fund's method renders the phrase "in the case of a partial withdrawal" superfluous. In fact, the Fund's calculation would have proceeded the same way if that phrase did not appear in the second adjustment. The Fund would have started by calculating the allocable amount of unfunded vested benefits to be $17,331,978. (Dkt. 31-4, p. 8) It then would have determined that the "de minimis" adjustment in section 1389 does not apply. Next, because it is a complete withdrawal, it would skip section 1386(a) (the partial reduction fraction) but would still apply the prior partial credit in section 1386(b) to reduce Perfection's allocable amount of unfunded vested benefits to $15,899,740. (*Id*.) Then, the Fund would apply the 20-year limitation in section 1399(c)(1)(B), (but again fail to reduce the annual payment), which would bring the amount to $6,318,741. (*Id*.) Finally, it would determine that the section 1405 adjustment does not apply. Of course, this is exactly what the Fund did

under the statute including the limiting phrase "in the case of a partial withdrawal."[21]

Because the same result would be reached if the phrase "in the case of a partial withdrawal" were erased, the Fund's method (and the lower court's construction) renders that phrase meaningless. But courts "usually presume that Congress doesn't use needless words," *Pate*, 84 F.4th at 1205, and are "particularly careful not to render any portion of the statute superfluous, if possible." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1173 (11th Cir. 2003). Thus, "every word and every provision is to be given effect," and none should be interpreted so as "to have no consequence." *In re Appling*, 848 F.3d 953, 959 (11th Cir. 2017), *quoting* READING LAW, p. 174.

This Court should give effect to the phrase used by Congress by reading it consistent with its plain meaning – to apply "in the case of a

---

[21] In fact, without the phrase "in the case of a partial withdrawal," the Fund's arguments would improve because there would be no need to maneuver around the fact that the second and third adjustments contain that limiting language. Of course, the credit would still reduce "withdrawal liability," which cannot take place until after the withdrawal liability has been calculated. 29 U.S.C. §1386(b)(1). So even in the absence of the phrase "in the case of a partial withdrawal," the credit cannot be applied at the second adjustment.

partial withdrawal," and not to apply in the case of a complete withdrawal. *See CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001) (unless "it is absurd, ridiculous, or ludicrous for Congress to have decided the matter in the way the plain meaning of the statutory language indicates it did," a court must follow the plain meaning of the statutory text).

**B.    In cases where both would otherwise apply, the District Court's interpretation would read out of the statute either the prior partial credit or the 20-year payment cap.**

To its credit, the Fund frankly admits that "Perfection's complete withdrawal assessment would have remained the same whether or not the Fund applied any credit resulting from Perfection's prior partial assessment," and "that the impact of Perfection's prior partial withdrawal liability credit on Perfection's complete withdrawal liability assessment was effectively zero." (Dkt. 14, ¶45-46) This was because, as admitted by the Fund Actuary, the Fund applied the credit "against a number that Perfection was never obligated to pay," namely, amounts that were already not assessable due to the 20-year payment cap. (Dkt. 31-29, p. 155)

This demonstrates an additional problem with the decision of the lower court – where both the prior partial credit (§1386(b)(1)) and the 20-year payment cap (§1399(c)(1)(B)) would otherwise independently apply, the application of both in the manner allowed here renders one or the other inoperative.

For example, if (as here) the prior partial credit is smaller than the amount that otherwise would have been cut off by the 20-year cap, as here, the amounts for which the employer is given "credit" would never have been payable anyway, because the 20-year payment cap would have limited the amount. But if the prior partial credit exceeds the amount that otherwise would have been limited by the 20-year payment cap, the 20-year payment cap no longer applies.

To further illustrate – in 2018, the 20-year payment cap would in all instances have limited Perfection's allocable amount of unfunded vested benefits to $6,318,741. (Dkt. 31-4, p. 8) As the Fund Actuary testified, "Perfection would have owed $6,318,741 for the complete withdrawal, *even if there were no prior partial*" withdrawal. (Dkt. 31-29, p. 123) (emphasis added). So when the Fund reversed its usual method and original calculations and applied Perfection's credit against the

allocable amount of unfunded vested benefits of $17,331,978, it was "taking the credit against an amount for which the employer was not responsible to pay," (Dkt. 31-28, p. 71) which rendered the credit illusory. (Dkt. 31-4, p. 8)

On the other hand, Perfection's method would determine the amount of withdrawal liability by applying the 20-year payment cap to limit the allocable amount of unfunded vested benefits, and then applying the prior partial credit to reduce *that amount* commensurate with the fact that it is already liable for a 34% prior partial withdrawal. This construction, which gives effect to each clause and does not render either provision inoperative or of no effect, is preferable to one that does. *In re Appling*, 848 F.3d at 959.

Moreover, this is consistent with the purpose of the credit, which is that "the liability for any complete or partial withdrawal in a subsequent year" should "properly reflect[] the employer's share of liability with respect to the plan." 29 U.S.C. §1386(b)(2). This purpose, gleaned directly from the statutory text, supports Perfection's preferred method. *U.S. v. Bryant*, 996 F.3d 1243, 1256 (11th Cir. 2021) ("As between two competing interpretations, we must favor the textually permissible interpretation

that furthers rather than obstructs the statute's purposes."), *citing* READING LAW, p. 63.

Because the credit applies to reduce "withdrawal liability," 29 U.S.C. §1386(b)(1), and "withdrawal liability" is the only amount a plan is authorized to "collect," 29 U.S.C. §1382(3), the credit is obviously meant to reduce the amount an employer would otherwise pay, and the amount a plan would otherwise collect. *Id*. And because withdrawal liability is payable for a maximum of 20 years, by definition, where a credit applies, a plan should not receive 20 years of payments on the subsequent withdrawal.

Here, however, the Fund is receiving the maximum amount for Perfection's subsequent complete withdrawal even though Perfection already experienced and is paying a 34% partial withdrawal. That is, the Fund is receiving payment for the 2016 partial as well as receiving full payment for the 2018 complete withdrawal *as if there had never been a prior partial withdrawal*. That is having one's cake and eating it, too.[22]

---

[22] In an explanation of the bill's provisions, Congress referred to the credit as an "offset" against subsequent liability. *See* CONGRESSIONAL RECORD, p. 20193 (July 29, 1980) ("Under the bill, if withdrawal liability is determined on account of a partial withdrawal, the amount of the liability (adjusted for any abatement or other reduction) is applied as an offset

The statute requires the credit ("the amount of any partial *withdrawal liability* … of the employer with respect to the plan for a previous plan year") to reduce "any *withdrawal liability* of that employer for a partial or complete withdrawal from that plan in a subsequent plan year[.]" 29 U.S.C. §1386(b)(1). The Fund has no problem acknowledging that the "withdrawal liability" on which Perfection's credit is based is limited by the 20-year payment cap but seeks to apply that credit against an amount that has not been capped by the 20-year limitation. Even the Fund Actuary acknowledged this is "inconsistent." (Dkt. 31-29, p. 156-57)

The District Court said it was "not the place of the court to rewrite or interpret the statute purposively to correct a perceived flaw," (Dkt. 44, p. 27) but this is no perceived flaw – either "withdrawal liability" is capped by the 20-year limitation or it is not. It cannot mean the 20-year

---

against withdrawal liability for any future withdrawal from the plan, whether partial or complete."). This "offset" of liability is consistent with the general understanding of "credit," which means "a deduction from an amount otherwise due." *See Merriam-Webster* (https://www.merriam-webster.com/dictionary/credit) For example, tax credits reduce one's tax liability, just as a partial withdrawal credit reduces one's subsequent withdrawal liability. Indeed, the *Cambridge Dictionary* similarly defines credit as "an amount of money you do not have to pay," and uses as an example a tax credit.
(https://dictionary.cambridge.org/us/dictionary/english/credit)

capped amount when it harms Perfection (by limiting its credit), and then mean the uncapped allocable amount of unfunded vested benefits when it helps the Fund (applying the credit against an uncapped amount). *Regions Bank*, 936 F.3d at 1192 ("A word or phrase is presumed to bear the same meaning throughout a text").

## C. The PBGC's rejection of the District Court's interpretation is persuasive and correct.

To the extent the proper interpretation of the statute is unclear or ambiguous, the Court should heavily weigh the views of the PBGC. *Blessitt v. Retirement Plan for Employees of Dixie Engine Co.*, 848 F.2d 1164, 1172 (11th Cir. 1988) ("we owe particularly great deference to PBGC interpretations of Title IV of ERISA[.]").

For more than four decades, that federal agency has taken the position that where there is a credit for a prior partial withdrawal, the plan must first calculate the subsequent withdrawal liability, "and then reduce that amount by the amount of partial withdrawal liability previously assessed." PBGC Opinion Letter 82-35, p. 1 (November 15, 1982). In fact, the PBGC has long since declared Perfection's method of applying the credit "correct," and the Fund's method "clearly erroneous." PBGC Opinion Letter 85-4, p. 1 (January 30, 1985).

The PBGC's analysis broadly tracks the primary legal arguments set forth herein. First, the PBGC noted that "Section 1381(b)(1) defines withdrawal liability as the result of four potential adjustments to an employer's allocable amount of unfunded vested benefits (which is calculated under Section 1391)." PBGC Op. Ltr. 85-4, p. 1. It then stated that "[t]he second of these adjustments (Section 1381(b)(1)(B)) is made in accordance with Section 1386 *in the case of a partial withdrawal.*" *Id.* (emphasis added).

The PBGC then turned to the language of Section 1386(b)(1) and found that because the prior partial credit reduces *withdrawal liability*, it can be applied only *after* that withdrawal liability is calculated pursuant to section 1381(b)(1). PBGC Op. Ltr. 85-4, p. 2. Finally, because the prior partial credit "applies to either a partial or complete withdrawal while Section 1381(b)(1)(B) applies only to a partial withdrawal," the PBGC concluded that the prior partial credit "is not an adjustment under Section 1381(b)(1) at all[.]" *Id.*, p. 2. Accordingly, the PBGC declared:

> [I]t is our opinion that the reduction in an employer's withdrawal liability required by Section 1386(b)(1) on account of a previous partial withdrawal assessment *must be made after the employer's subsequent withdrawal liability is calculated* in accordance with Section 1381(b) (without regard to Section 1386(b)(1)). *Id.* (emphasis added).

This is consistent with the MPPAA's instruction that the credit reduce "any withdrawal liability" of a previously withdrawn employer in a subsequent plan year. 29 U.S.C. §1386(b)(1). This Court should "presume that Congress said what it meant and meant what it said." *Autauga County Emergency Mgmt.*, 17 F.4th at 99.

While the lower court found it "unpersuasive," (Dkt. 44, p. 28) the PBGC opinion letter aligns with the proper construction of the statute, honors rather than disregards the statutory definitions, applies consistently the phrase "in the case of a partial withdrawal," and recognizes the fundamental difference between withdrawal liability. PBGC Op. Ltr. 85-4. Thus, to the extent the statute is unclear in any way, this Court should consider the PBGC's reasoning. *See Gregory v. First Title of America, Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009) (agency opinion letters are "entitled to respect … to the extent that those interpretations have the power to persuade.").

A federal agency is entitled to even greater deference when it acts pursuant to expressly delegated authority. *See Alliance for Community Media v. F.C.C.*, 529 F.3d 763, 776 (6th Cir. 2008) ("a very good indicator of delegation meriting *Chevron* treatment is express congressional

authorizations to engage in the process of rulemaking that produces regulations or rulings for which deference is claimed."). And in the MPPAA, Congress authorized the PBGC to issue regulations related to the prior partial credit "so that the liability for any complete or partial withdrawal in any subsequent plan year … properly reflects the employer's share of liability with respect to the plan." 29 U.S.C. §1386(b)(2).[23]

Pursuant to that delegated authority, the PBGC promulgated regulations, one of which states that an employer previously assessed withdrawal liability for a partial withdrawal "shall receive a credit against the new withdrawal liability" for any withdrawal in a subsequent plan year. 29 C.F.R. § 4206.3. This regulation reiterates and makes clear that the reduction called for by the statute is a "credit," or a deduction *from an amount otherwise due. Id*. Moreover, consistent with Perfection's

---

[23] Despite its prior 34% prior partial withdrawal, Perfection must pay 100% of its maximum complete withdrawal for 2018. This results in a combined liability significantly *higher* than had Perfection experienced a complete withdrawal alone, in either withdrawal year – $8,547,009 (Dkt. 31-11, p. 5) versus $6,509,962 (2016) (Dkt. 31-4, p. 6) or $6,318,741 (2018). (Dkt. 31-4, p. 8)

position, according to the PBGC this credit is taken "against" the "new" "withdrawal liability." 29 C.F.R. §4206.3.

Another PBGC regulation interprets the credit to apply such "that when an employer that has partially withdrawn from a plan subsequently incurs liability for another partial or a complete withdrawal from that plan, the employer's liability for the subsequent withdrawal is to be reduced by the amount of its liability for the prior partial withdrawal." 29 C.F.R. §4206.1(a). That same regulation also states that "[t]he purpose of the credit is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits of the plan." 29 C.F.R. §4206.1(a). Despite this, under the Fund's method, both sides agree Perfection is being double charged for the unfunded vested benefits attributable to three of the five years at issue in the complete withdrawal. (Dkt. 31-29, p. 159-60) (Dkt. 31-11, p. 6)

In sum, for more than four decades the PBGC has consistently taken the position, both in opinion letters and in regulations promulgated through notice and comment rulemaking, that the credit is applied exactly as the statute states – to reduce *withdrawal liability*. Respectfully, to the extent it perceives any ambiguity on this issue, this

Court should defer to the well-reasoned and experienced views of the PBGC. *Mayo Found. for Med. Educ. & Research v. U.S.*, 562 U.S. 44, 57 (2011) ("such express congressional authorizations to engage in the process of rulemaking [are] a very good indicator of delegation meriting *Chevron* treatment.").

Neither the Fund nor the lower court has ever explained how a credit that reduces "withdrawal liability" can be applied before that withdrawal liability is determined, nor has anyone ever explained why a provision expressly limited to "the case of a partial withdrawal" applies to a complete withdrawal.

The Fund will surely rely heavily on *GCIU v. Quad/Graphics*, as it did when it switched its method and changed its original calculations. 909 F.3d 1214 (9th Cir. 2018). But that opinion also has no answer to the questions central to this dispute, and its unwitting recognition that a provision that reduces debt "can only logically be applied *after* that withdrawal liability is calculated," *Quad Graphics*, 909 F.3d at 1218, strongly supports Perfection's argument (and the PBGC's opinion) that

the credit must apply "*after* the employer's subsequent withdrawal liability is calculated[.]" PBGC Op. Ltr. 85-4 (emphasis added).[24]

## VI.  CONCLUSION

Respectfully, this Court should reverse the judgment of the District Court and direct it to grant summary judgment for Perfection Bakeries and against the Fund.

Dated:  December 15, 2023

Respectfully submitted,

/s/ Mark M. Trapp
Mark M. Trapp
Conn Maciel Carey LLP
53 W. Jackson Blvd., Suite 1352
Chicago, Illinois 60604
(312) 809-8122
mtrapp@connmaciel.com

*Counsel for Perfection Bakeries, Inc.*

---

[24] *Quad/Graphics* is not binding here. *Pitts v. United States*, 4 F.4th 1109, 1116 fn. 3 (11th Cir. 2021).

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32

The undersigned, counsel of record for Plaintiff-Appellant, Perfection Bakeries, Inc., furnishes the following in compliance with Federal Rule of Appellate Procedure 32(g)(1).

I hereby certify that this brief complies with the type-volume limit in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The length of this brief is 12,507 words. This document has been prepared in a proportionally spaced typeface, using Word with 14pt Century Schoolbook.

Dated: December 15, 2023

*/s/ Mark Trapp*
Mark M. Trapp

*Attorney for Perfection Bakeries, Inc.*